656 F.2d 1368
 25 Wage & Hour Cas. (BN 105, 25 Wage & Hour
Cas. (BN 195,
92 Lab.Cas. P 34,075
 Raymond DONOVAN,* Secretary of Labor, United
States Department of Labor, Plaintiff-Appellee,
v.
SUREWAY CLEANERS, a corporation, Sexton Cleaners, Inc., a
corporation, and Pay-Less Cleaners, a corporation,
Defendants-Appellants.
 No. 79-4778.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 11, 1981.
Decided Sept. 21, 1981.
 
 Dennis R. Murphy, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for defendants-appellants.
 Barbara E. Kahl, Atty., Washington, D. C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before HUG, POOLE and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge.
 
 
 1
 Sureway Cleaners[1] appeals from a district court determination that (1) despite changes in the contracts with its "agents," the "agents" continue to be "employees" rather than independent contractors within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, and (2) the statute of limitations, 29 U.S.C. § 255(a), applicable to the underlying overtime violations does not apply to a civil contempt proceeding brought by the Secretary to enforce an outstanding injunction granted in a previous action under section 17 of the Act, 29 U.S.C. § 217. We affirm.
 
 
 2
 Sureway is engaged in the laundry and dry cleaning business. Prior to 1971, Sureway owned or leased a total of 105 retail outlets. Most of these outlets were operated by "agents" pursuant to a written agreement (the pre-judgment contract). Today Sureway owns or leases ninety-one retail outlets. Twenty-five of the outlets are company stores in which Sureway concedes the workers are employees. However, Sureway maintains that the remaining sixty-six are operated by "agents" who are independent contractors and not employees.
 
 
 3
 In 1971 the Secretary of Labor brought suit under section 17 of the FLSA[2] against Sureway, claiming that Sureway had violated the overtime compensation[3] and recordkeeping provisions of the FLSA. The Secretary sought an injunction to prevent further violations of the Act by Sureway. On October 29, 1971, the district court held that Sureway's "agents" were employees rather than independent contractors. The court therefore ruled that the employees were entitled to overtime compensation. A permanent prospective injunction was granted.
 
 
 4
 Thereafter, Sureway issued a new contract (the first post-judgment contract) in an attempt to convert its court-determined "employees" into independent contractors. Of the sixty-six retail outlets, forty now operate pursuant to the first post-judgment contract. The remaining twenty-six operate under a second post-judgment contract (a franchise agreement) which was issued after a 1975 determination by the State of California that Sureway was offering a franchise.[4]
 
 
 5
 On September 22, 1975, the Secretary filed an application for enforcement of the 1971 injunction because Sureway had failed to pay overtime compensation to its employees. The Secretary disputed Sureway's assertion that its workers were independent contractors. Instead, the Secretary argued that they were still employees within the meaning of the Act and thus entitled to overtime compensation. The district court agreed with the Secretary and found Sureway in contempt of the 1971 injunction. The court ordered Sureway to pay its employees the withheld overtime compensation.
 
 
 6
 On appeal, Sureway argues that the post-judgment contracts with its retail outlets had substantially changed the employment relationship so as to make the employees genuine independent contractors. Alternatively, Sureway claims that even if it was properly found in contempt of the 1971 injunction, its liability for unpaid overtime compensation is limited by the statute of limitations contained in section 255(a).
 
 I. EMPLOYEE OR INDEPENDENT CONTRACTOR
 
 7
 In determining whether a person is an "employee" for purposes of social legislation such as the FLSA, the courts have identified a number of factors that should be considered. Although the list is not exhaustive, the court in Real v. Driscoll Strawberry Associates, Inc., 603 F.2d 748 (9th Cir. 1979), identified the following relevant factors:
 
 
 8
 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.
 
 Id. at 754 (footnote omitted).[5]
 
 9
 Neither the presence nor the absence of any individual factor is determinative. Whether an employer-employee relationship exists depends "upon the circumstances of the whole activity," Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947), and ultimately, whether, as a matter of economic reality, the individuals "are dependent upon the business to which they render service." Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947).
 
 
 10
 The district court, after an extensive analysis of the facts, and under the factors identified in Real v. Driscoll Strawberry, supra, concluded that Sureway's "agents" were in fact employees within the meaning of the Fair Labor Standards Act. After reviewing each of the six factors considered by the district court, we agree with the district court that Sureway's "agents" were, as a matter of economic reality, dependent on Sureway and therefore within the protections and benefits afforded by the Act.
 
 A. Control
 
 11
 The post-judgment contracts require that all work taken in by the "agents" be performed by Sureway's plants. The "agents" therefore have no control over where to send the items they receive for cleaning or repair, and are denied the power to search out the best price. In addition, Sureway selects the location of the retail outlets, owns or leases them, supplies the fixtures, furnishes the supplies, pays all real and personal property taxes levied on the outlets, does most of the advertising,[6] unilaterally imposes the terms of the contracts,[7] pays all utility bills which it then charges to the "agent's" accounts, and requires the "agents" to charge the advertised price on any advertised specials. Further, an agent may not assign his rights under the contract unless Sureway consents. Although the district court found that the "agents" could now set their own hours and retail prices, it also found that in practice most outlets were open similar hours and that Sureway supplied a "suggested price list" which was usually adhered to.
 
 
 12
 Sureway argues that the district court failed to recognize the "extensive powers and options" exercised by several of its "agents."[8] This argument, however, ignores the "circumstances of the whole activity" and the "economic reality" of sixty-four "agents" and focuses instead on specific factors relating to two. The district court was correct in its analysis of this factor when it suggested that "(i)n evaluating control, the test is not what the 'agent' could do but what in fact the 'agent' does do." E.g., Usery v. Pilgrim Equipment Co., Inc., 527 F.2d 1308, 1312 (5th Cir.), cert. denied, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); Mednick v. Albert Enterprises, Inc., 508 F.2d 297, 302-03 (5th Cir. 1975). Thus, the fact that Sureway's "agents" possess, in theory, the power to set prices, determine their own hours, and advertise to a limited extent on their own is overshadowed by the fact that in reality the "agents" work the same hours, charge the same prices, and rely in the main on Sureway for advertising.
 
 
 13
 Regarding the issue of control in Usery v. Pilgrim, the court there stated: "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." 527 F.2d at 1313. In the instant case, we agree with the district court's conclusion that Sureway, rather than its "agents," exercises control over the meaningful aspects of the cleaning business.
 
 B. Risk of Profit and Loss
 
 14
 "Agents" make no capital investment and therefore bear no risk of a significant loss; most of the factors that determine profit (advertising, price setting, location, etc.) are controlled by Sureway. Although "agents" are responsible for bad checks, theft losses, and the disposal of abandoned clothing, the district court found these to be burdens that Sureway chose to place on them. See Usery v. Pilgrim, 527 F.2d at 1313. Thus, the lack of opportunity for loss of capital investment and the control by Sureway of the major factors determining profit indicate that in this respect also the "agents" are economically dependent upon Sureway.
 
 C. Investment
 
 15
 "Agents" make no capital investment. A new "agent" simply buys out the old "agent's" stock, and gets his or her money back when customers pick up their belongings. A similar investment plan was properly characterized by the court in Pilgrim as "nothing more than a method of settling accounts between outgoing and incoming operators" and has no relationship to the cost of setting up and operating a retail outlet. 527 F.2d at 1313-14.
 
 
 16
 The district court further found that while the "agents" pay more rent under the post-judgment contracts, they also get more return on the first $100 of cleaning. The end result of these contractual changes is that the latter change offsets the former.[9] Based on these facts, the district court was correct in concluding that Sureway, and not the "agents," supplies the necessary risk capital to run the retail outlet.
 
 D. Skills
 
 17
 Neither long training nor highly developed skills are required to run a retail outlet. A new "agent" can be completely trained in five days. Notwithstanding this, Sureway maintains that the profitability of the various outlets depends upon the initiative and business acumen of each "agent." Sureway apparently overlooks the fact that all major aspects of the business open to initiative advertising, price setting, power to choose cleaning plants and thereby get the best price are controlled by Sureway. Consequently, the only skills required are those minor ones that Sureway initially teaches its "agents."
 
 E. Permanency
 
 18
 Whereas true independent contractors have a fixed employment period and generally offer their services to different employers, the district court found that Sureway's "agents" do not transfer from one place to another as particular jobs are offered to them. In addition, the "agents" have generally worked continuously for Sureway for long periods of time. Thus, the district court properly concluded that these "agents" have nothing to transfer but their own labor, and are dependent upon Sureway's continued employment.
 
 F. Integral Economic Relationship
 
 19
 Finally, the district court determined that Sureway's cleaning plants and its "agent"-run outlet pickup stations function as interdependent economic units. "Agents" do the same work as those individuals explicitly hired as employees, with the outlets serving as neighborhood collection points. Thus, the "agents" are an essential part of Sureway's operation. Hodgson v. Ellis Transportation Co., 456 F.2d 937, 940 (9th Cir. 1972).
 
 
 20
 From the foregoing analysis, we are convinced that as a matter of economic reality the "agents" are dependent upon the business to which they render service and therefore are employees within the meaning of the Fair Labor Standards Act. Although Sureway has made changes in the contracts with its "agents," the changes have been at most superficial. Sureway's relationship with its "agents" has not changed in any meaningful way since the permanent injunction was granted in 1971. If after altering the contracts Sureway was unsure as to the applicability of the prior injunction, it could have petitioned the court for a modification or clarification of the order. See Regal Knitwear Co. v. NLRB, 324 U.S. 9, 15, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945). By in effect making its own determination as to what the injunction meant, Sureway acted at its peril. As stated by the Court in McComb v. Jacksonville Paper Co.:
 
 
 21
 It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to (a) program of experimentation with disobedience of the law....
 
 
 22
 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949).[10]
 
 
 23
 We therefore agree with the lower court's determination that Sureway is in contempt of the 1971 injunction and is thus liable for unpaid overtime compensation.
 
 II. STATUTE OF LIMITATION
 
 24
 Sureway argues that even if it is liable for unpaid overtime compensation, the extent of its liability is limited by section 255(a), 29 U.S.C. § 255(a),[11] which requires all actions for unpaid overtime compensation to be commenced within two years, or three years if the violation is "willful." In the instant case, the Secretary was granted the permanent injunction on October 29, 1971. Almost four years later, on September 22, 1975, the Secretary filed the civil contempt application. The issue raised is whether, as the Secretary argues, a civil contempt proceeding is part of the original cause of action and is therefore not subject to section 255(a)'s limitation period, or whether, as Sureway maintains, the contempt proceeding is a new independent action itself subject to the limitation period.
 
 
 25
 If section 255(a) applies to contempt proceedings, then Sureway's liability would be limited to the period commencing on (1) September 22, 1973, two years before the date of filing of the civil contempt application, or (2) September 22, 1972, three years before that date. If a contempt proceeding is not an independent action, then Sureway's liability would commence on October 29, 1971. We would not have thought this issue worthy of serious discussion but for the fact that the Fifth and Sixth Circuits have considered the question and have come to different conclusions.
 
 
 26
 The better reasoned opinion is the Fifth Circuit's decision in Wirtz v. Ocala Gas Co., 336 F.2d 236 (1964). The court in Ocala Gas held that the limitation provision of section 255(a) does not apply to civil contempt proceedings for violations of FLSA injunctions. The court noted that the filing of a civil contempt petition is not the commencement of an independent cause of action, as is contemplated by the language of section 255(a), but rather is a part of the original cause of action. See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932); Gompers v. Buck's Stove Range Co., 221 U.S. 418, 444-45, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911). Civil contempt is a proceeding instituted in furtherance of an existing cause of action. It merely remedies the disobedience of an injunction already entered by the court. Jacksonville Paper Co., 336 U.S. at 193-94, 69 S.Ct. at 500-01. In the instant case this is evidenced by the fact that the contempt proceeding was not instituted to seek relief for violations of the FLSA, but instead to enforce the 1971 injunction.
 
 
 27
 The contrary decision of the Sixth Circuit, Wirtz v. Chase, 400 F.2d 665 (6th Cir. 1968), came after that court had earlier affirmed a district court decision, Tobin v. Frost-Arnett Co., 34 Lab. Cas. P 71,220 (W.D. Tenn.1958), aff'd per curiam, 264 F.2d 246 (6th Cir. 1959), where the district court had faced the same issue we face regarding the application of section 255(a) to contempt proceedings. The district court in Frost-Arnett had unequivocally held section 255(a) inapplicable:
 
 
 28
 Since this is not a new cause of action but a further step in the original proceeding herein to enforce an equitable remedy for civil contempt, growing out of defendant's noncompliance with the Court's original decree, the employees herein are entitled to be compensated for the periods set out in the petition, irrespective of any limitations fixed by the (section 255).
 
 
 29
 Frost-Arnett, 34 Lab. Cas. at P 71,220, quoted in Chase, 400 F.2d at 668. In attempting to explain its apparent about-face in its ruling in Chase, the Sixth Circuit explained that a 1961 amendment to section 17 had "evidenced a purpose to limit the recovery allowable in proceedings brought by the Secretary, including those for civil contempt, by the statute of limitations contained in § 255." 400 F.2d at 668.
 
 
 30
 Prior to 1961, the Secretary was empowered to bring suits for prospective relief under section 17 of the Act.[12] That section, however, permitted the Secretary to seek only prospective relief, and expressly barred restitutionary injunctions. Section 17 contained the following proviso:
 
 
 31
 Provided, That no court shall have jurisdiction, in any action brought by the Administrator to restrain such violations, to order the payment to employees of unpaid minimum wages or unpaid overtime compensation or an additional equal amount as liquidated damages in such action.
 
 
 32
 63 Stat. 920 (1949). In 1961 Congress amended section 17, deleted the proviso, and substituted therefor the present statutory language, which affords the district courts the power to grant restitutionary injunctions in cases involving violations of the minimum wage or overtime provisions of the Act:
 
 
 33
 The district courts ... shall have jurisdiction ... to restrain violations of section 215 of this title, including in the case of (minimum wage or overtime violations) the restraint of any withholding of payment ... found by the court to be due to employees under this chapter (except sums which employees are barred from recovering, at the time of the commencement of the action to restrain the violations, by virtue of the provisions of section 255 of this title).
 
 
 34
 29 U.S.C. § 217 (emphasis added to language of 1961 amendment).
 
 
 35
 As the Sixth Circuit apparently concedes, prior to 1961 the Secretary was not limited by the limitations period contained in section 255(a) when seeking back compensation as relief in a contempt proceeding for violation of a prospective injunction. When, in 1961, the Secretary was granted the power to seek restitutionary injunctions, the enabling amendment included a parenthetical reference to section 255, stating that the back compensation to be obtained under that amendment was limited to the same time period for which the employees could have sought back compensation in a direct suit seeking such relief. The effect of the 1961 amendment was to allow the Secretary, for the first time, to initiate a restitutionary action seeking back compensation on behalf of employees who were entitled to that relief. The parenthetical reference to section 255 was intended to make it clear that in exercising this new power the Secretary could not seek back compensation for a longer period than the employees could have, had they initiated a suit directly.
 
 
 36
 The purpose of the 1961 amendment was to broaden, not to limit, the Secretary's authority. There is no reason in policy, logic, or in tenets of grammatical construction to deduce that the parenthetical reference to section 255 was intended to limit the Secretary's preexisting authority to seek back compensation in connection with contempt proceedings for violations of prospective injunctions. Nevertheless, the court in Chase concluded that Congress intended to do so, notwithstanding the absence of any legislative history supporting that result.[13]
 
 
 37
 We are persuaded not to follow the decision in Chase for several reasons. First, section 255 was adopted in 1947 to protect employers from incurring "wholly unexpected liabilities" which "would bring about financial ruin." 29 U.S.C. § 251(a). At the time that congressional declaration of policy was made, the district courts had authority to grant only prospective injunctive relief, and section 17 consequently contained no reference to any limitations period. When Congress amended section 17 to allow restitutionary relief, it limited that relief, and only that relief, by the parenthetical subordinate clause referring to section 255. Such would appear consistent with the policy stated in section 251(a) to avoid "wholly unexpected liabilities," as a suit by the Secretary under section 17 is a new action raising claims of which an employer would not have been previously aware. Once a prospective injunction has been issued against an employer, however, the employer is put on notice that future violations will result in civil contempt proceedings to enforce the injunction. Under these circumstances the employer would not incur any "wholly unexpected liabilities." Thus, applying section 255(a) to contempt proceedings would not only be contrary to the purpose of the statute, it would also reward a wrongful employer who violated an injunction and escaped detection by the Secretary for a period of two or three years.
 
 
 38
 A second reason not to follow the Chase decision was expressed by the court in Ocala Gas. Section 255(a) applies to an "action commenced ... to enforce any cause of action ...." The Supreme Court has stated that because a contempt proceeding is merely a court's way of enforcing its prior determination, Jacksonville Paper, 336 U.S. at 193-94, 69 S.Ct. at 500-01, it is not to be regarded as an independent action but as part of the original cause of action. Gompers, 221 U.S. at 444-45, 31 S.Ct. at 499. Because of the plain meaning of the statute, then, we are persuaded that section 255(a) cannot reasonably be found to apply to contempt proceedings.
 
 
 39
 Finally, to hold that section 255(a) applies to a contempt proceeding would limit the effectiveness of an injunction as a means of providing prospective relief. As recently noted by this court in Marshall v. Chala Enterprises, Inc., 645 F.2d 799, 803-04 (9th Cir. 1981), prospective injunctions are essential in effectuating the policy of the FLSA because they place the risk of non-compliance squarely on the employer. See also S.Rep.No.145, 87th Cong., 1st Sess. 40, reprinted in (1961) U.S.Code Cong. & Adm.News 1620, 1658. In quoting from Mitchell v. Pidcock, 299 F.2d 281, 287 (5th Cir. 1962), the court in Chala stated that " 'the manifest difficulty of the Government's inspecting, investigating, and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction ....' " Chala, 645 F.2d at 804. To apply the limitations provision to injunctive enforcement proceedings would shift the risk of the employer's non-compliance to the employees after the limitations period has expired; we have no hesitation in concluding that once a violation has been found, that risk should rest with the employer beyond the two or three year period specified for the original cause of action in section 255.
 
 
 40
 If section 255(a) applied to contempt proceedings, the Secretary would be required, in order to assure continuing compliance, to investigate, every two or three years, each employer that was subject to such an injunction. As the district court in the present case pointed out, "(t)he injunction would thus not save the expense of repeated investigations nor would it eliminate the need for bringing such offenders to court every few years." We might add that it would subject the rights of employees under the Act to the vicissitudes of the resources and inclination of the Secretary to conduct such investigations. That result would be contrary to the remedial purpose of the Fair Labor Standards Act.
 
 
 41
 We therefore affirm the district court's determination that section 255(a) does not apply to a contempt proceeding brought to enforce a prospective injunction. We hold that Sureway is liable for overtime compensation for the time period commencing on October 29, 1971.
 
 
 42
 AFFIRMED.
 
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c), we substitute Secretary Donovan for former Secretary Ray Marshall
 
 
 [1]
 The appellants in this action consist of three related corporations: Sureway, Pay-Less Cleaners, and Sexton Cleaners. The shares of all three corporations are owned by one individual and his family with that individual serving as the president and director of the corporations. For purposes of this case, all three corporations are grouped together and referred to as "Sureway."
 
 
 [2]
 Section 17 of the Act provides:
 § 217 Injunction proceedings
 The district courts ... shall have jurisdiction ... to restrain violations of ... any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter (except sums which employees are barred from recovering, at the time of the commencement of the action to restrain the violations, by virtue of the provisions of section 255 of this title).
 
 
 [3]
 Section 7(a)(1) of the Act provides:
 § 207 Maximum Hours
 (a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.
 
 
 [4]
 Only the "agents" who contracted with Sureway after the determination issued by the State of California operate pursuant to a franchise contract
 
 
 [5]
 These factors are a summation of what the Supreme Court has deemed relevant. See Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947)
 
 
 [6]
 Sureway allows individual advertising, and occasionally an "agent" will do so. This is insignificant, however, in light of the substantial advertising done by Sureway (5% 51/2% of gross). Additionally, each "agent" is charged 1% of his or her gross for advertising
 
 
 [7]
 All 40 "agents" operate under the same contract and all 26 franchise "agents" operate under the same contract
 
 
 [8]
 One "agent" expanded his retail outlet to include an alterations department, an engraving department, and a name tag/monogramming department. Another "agent" altered her store by joining the laundromat adjacent to her. In addition, she has established an alterations department and changed the name of her business establishment
 
 
 [9]
 Under the pre-judgment contract, rent and use of fixtures cost the "agents" $1. Under the post-judgment contract, rent is presently fixed at $30 per week and the fixtures are leased for $4 per week. Adding this to the advertising and utility charges, the total weekly payment is approximately $48.50 (this figure refers to an example used at trial). Under the pre-judgment contract, the agent received 21% of all revenue from cleaning taken in. Under the first post-judgment contract, the agent receives 68% of the first $100, i. e., $47 more. Thus "agents" are debited an additional $47.50 in weekly fees, but are given $47 more than before from the first $100 taken in
 
 
 [10]
 It is not necessary that purposeful evasion of the injunction be shown, as the injunction itself is remedial and not punitive in nature. Jacksonville Paper, 336 U.S. at 191, 69 S.Ct. at 499
 
 
 [11]
 Section 255 states as follows:
 § 255 Statute of Limitations
 Any action commenced on or after May 14, 1947, to enforce any cause of action for ... unpaid overtime compensation ... under the Fair Labor Standards Act (a) ... may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued....
 
 
 [12]
 The Secretary's authority to seek injunctive relief under § 17 is granted by § 16(c) of the Act, 29 U.S.C. § 216(c)
 
 
 [13]
 The court in Chase did not cite any legislative history for its conclusion of Congress's intention and an exhaustive search of the legislative history by this court has failed to locate any evidence of such intention