PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1944
_____

ALI RAZAK; KENAN SABANI; KHALDOUN
CHERDOUD, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,
Appellants

v.

UBER TECHNOLOGIES, INC.; GEGEN, LLC
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-16-cv-00573)
District Judge: Hon. Michael M. Baylson
_____

Argued January 15, 2019
_____

Before: SMITH, *Chief Judge*, GREENAWAY, JR., and
PORTER, *Circuit Judges*.

(Opinion Filed: March 3, 2020)

Jeremy E. Abay
John K. Weston
Sacks Weston Diamond
1845 Walnut Street
Suite 1600
Philadelphia, PA 19103


Ashley Keller                    **[ARGUED]**
Seth A. Meyer
Keller Lenkner
150 North Riverside Plaza
Suite 2570
Chicago, IL 60654
        *Counsel for Appellants*

Sharon M. Dietrich
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
        *Amicus Appellants*

Sophia Behnia
Littler Mendelson
333 Bush Street
34th Floor
San Francisco, CA 94104

Wendy S. Buckingham
Paul C. Lantis
Littler Mendelson
1601 Cherry Street
Suite 1400, Three Parkway

Philadelphia, PA 19102

Robert W. Pritchard          **[ARGUED]**
Joshua Vaughn
Littler Mendelson
625 Liberty Avenue
EQT Plaza, 26th Floor
Pittsburgh, PA 15222

Andrew M. Spurchise
Littler Mendelson
900 Third Avenue
8th Floor
New York, NY 10022
        *Counsel for Appellees*

Gabriel K. Gillett
Jenner & Block
353 North Clark Street
Suite 4500
Chicago, IL 60654

Adam G. Unikowsky
Jenner & Block
1099 New York Avenue
Suite 900
Washington, DC 20001
        *Amicus Appellees*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

This case is an appeal from a grant of summary judgment on the question of whether drivers for UberBLACK are employees or independent contractors within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and similar Pennsylvania state laws. For the following reasons, we will vacate the District Court's grant of summary judgment and remand for further proceedings.

## I.     Facts[1]

Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud[2] (collectively, "Plaintiffs") are Pennsylvania drivers who utilize Defendant Uber Technologies' ride-sharing mobile phone application ("Driver App"). Plaintiffs bring this action on behalf of a putative class of all persons who provide limousine

---

[1] The facts recited in this section are undisputed except as otherwise noted.

[2] Plaintiffs argue that each Plaintiff should be viewed as an individual for FLSA analysis purposes. However, the FLSA analysis would remain the same regardless of whether Plaintiffs are treated collectively or individually. *See United States v. Cook*, 795 F.2d 987 (Fed. Cir. 1986). Additionally, Plaintiffs do not present significantly distinguishable facts, as all are self-incorporated drivers and have made similar choices regarding business opportunities within the UberBLACK platform.

4

services, now known as UberBLACK, through Defendant's Driver App in Philadelphia, Pennsylvania.[3] Plaintiffs bring individual and representative claims against Uber Technologies, Inc. and its wholly-owned subsidiary, Gegen, LLC, ("Gegen," and collectively, "Uber") for violations of the federal minimum wage and overtime requirements under the FLSA, the Pennsylvania Minimum Wage Act ("PMWA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").

Plaintiffs Razak, Sabani, and Cherdoud each own and operate independent transportation companies ("ITCs")[4] Luxe Limousine Services, Inc. ("Luxe"), Freemo Limo, LLC ("Freemo"), and Milano Limo, Inc. ("Milano"), respectively. In order for drivers to contract to drive for UberBLACK, they must form ITCs. Each ITC, in turn, enters into a Technology Services Agreement with Uber. The Technology Services Agreement includes a Software License and Online Services Agreement that allows UberBLACK drivers to utilize the

---

[3] This case only pertains to UberBLACK drivers, and not drivers for other Uber platforms, such as UberX or UberPool. All references to "Uber drivers" only pertain to "UberBLACK drivers" in Philadelphia.

[4] ITCs are independent companies "in the business of providing transportation services." App. 385. Some ITCs are self-incorporated solo drivers, while others, like Plaintiffs' ITCs, are larger companies that work with additional drivers who utilize the Uber Driver App. Uber directly contracts with an ITC via their Technology Services Agreement.

technology service Uber provides to generate leads, as well as outlines the relationship between ITCs and Uber riders, ITCs and Uber, and ITCs and their drivers. Additionally, it describes driver requirements, vehicle requirements, financial terms, and contains an arbitration clause for dispute resolution between ITCs and Uber.

Uber also requires that drivers sign a Driver Addendum,[5] which is a legal agreement between the ITC and the for-hire driver, before a driver can utilize the Driver App. The Driver Addendum allows a driver to receive "lead generation and related services" through Uber's Driver App. App. 409. The Addendum also outlines driver requirements (such as maintaining a valid driver's license), insurance requirements, dispute resolution, and the "Driver's Relationship with Uber," in which Uber uses clear language to attempt to establish the parameters of the Driver's working relationship with Uber.[6] App. 411.

---

[5] The Driver Addendum states, "[i]n order to use the Uber Services, Driver and Transportation Company must agree to the terms and conditions that are set forth below. Upon Driver's execution (electronic or otherwise) of this Addendum, Driver and Transportation Company shall be bound by the terms and conditions set forth herein." App. 409.

[6] Boilerplate language in the Driver Addendum to the Technology Services Agreement sets forth, among other things, that ITCs "acknowledge[] and agree[] that Uber is a technology services provider" that "does not provide transportation services, function as a transportation carrier, nor

For UberBLACK, Uber holds a certificate of public convenience from, and is licensed by, the Philadelphia Parking Authority ("PPA") to operate a limousine company. Transportation companies and individual transportation providers who provide Black car services in Philadelphia are required to hold a PPA certificate of public convenience or associate with an entity that holds such a certificate. Some UberBLACK transportation providers operate under the PPA certificate held by Uber. Luxe, an ITC owned by Razak, operates under its own PPA certificate. Additionally, approximately 75% of UberBLACK drivers use Uber's automobile insurance.

Plaintiffs claim that they are employees, and sue Uber for violations of minimum wage and overtime requirements under federal and state laws. Under the FLSA, employers must pay employees the applicable minimum wage for each hour worked, and, if an employee works more than forty hours in a given week, the employer must pay one and a half (1 ½) times

operate[s] as a broker for transportation of passengers . . . ." App. 13. "ITCs shall provide all necessary equipment; Uber does not direct or control ITCs or their drivers generally or in their performance." *Id.* "ITCs and their drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Service, and ITCs agree to pay Uber a service fee on a per transportation services transaction basis." *Id.* ITCs must also "maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors . . . ." *Id.* The Driver Addendum also sets forth and requires that the relationship between the ITCs and their drivers is "contractual or [an] employment arrangement." *Id.*

7

the regular rate for each hour subsequently worked. 29 U.S.C. §§ 206–207. Plaintiffs contend that time spent online on the Uber Driver App qualifies as compensable time under the FLSA. Principal among Plaintiffs' arguments is that Uber controls the access and use of the Driver App.

To access Uber services, drivers open the Driver App on a mobile device, log in, and tap a button to be online. Once online, a driver can choose to accept a trip, but if the driver does not accept the trip within fifteen seconds of the trip request, it is deemed rejected by the driver. The Driver App will automatically route the trip request to the next closest driver, and if no other driver accepts the trip, the trip request goes unfulfilled, as Uber cannot require any driver to accept a trip. UberBLACK drivers are free to reject trips for any reason, aside from unlawful discrimination. However, if a driver ignores three trip requests in a row, the Uber Driver App will automatically move the driver from online to offline, such that he cannot accept additional trip requests.

Uber sets the financial terms of all UberBLACK fares, and riders pay by having their credit cards linked to the App. After a ride is completed, Uber charges the rider's credit card for the fare. Uber then deposits the money into the transportation company's Uber account with a commission taken out by Uber. The transportation company then distributes the payment to the driver who provided the ride.

Uber also has regulations under which it logs off drivers for a period of six hours if the driver reaches Uber's twelve-hour driving limit. Trip requests are generally sent to the driver closest in proximity to the requesting rider, and drivers have no way of knowing from the Uber Driver App what the demand for drivers is at any given time (and thus, how much their

earnings will be based on that demand). Drivers also do not know where a rider's final destination is prior to accepting the ride.

There is one exception affecting a driver's ability to accept trip requests from anywhere in Philadelphia. If a driver is at one of Philadelphia's major transportation hubs: 30th Street Train Station or Philadelphia International Airport, he must utilize a "queue" system that routes trips to the next driver in the queue, and the driver can only enter, or advance in, the queue while physically located inside a designated zone.

On appeal, Uber reasserts that Plaintiffs are not employees as a matter of law, and therefore, their putative class action should be subject to summary judgment. To support this contention, Uber portrays UberBLACK drivers as entrepreneurs who utilize Uber as a software platform to acquire trip requests. Uber asserts that Plaintiffs are not restricted from working for other companies, pay their own expenses, and on some occasions, engage workers for their own ITCs. They can use UberBLACK as little or as much as they want or choose not to work for UberBLACK and instead work for competitors such as Blacklane and Lyft.

Uber asserts that it places no restrictions on drivers' ability to engage in personal activities while online. Plaintiffs in this matter engaged in a range of personal activities, including accepting rides from private clients, accepting rides from other rideshare programs, sleeping, running personal errands, smoking cigarettes, taking personal phone calls, rejecting UberBLACK trips because they were tired, and conducting personal business.

Alternatively, Plaintiffs claim that they are "employees" under the FLSA because they are controlled by Uber when they are online and perform an integral role for Uber's business. The District Court agreed with Uber's position, and granted Uber's Motion for Summary Judgment on the question of whether Plaintiffs qualify as "employees" of Uber under the FLSA and PMWA. Plaintiffs now appeal from the summary judgment order.

## II.    Procedural History

Plaintiffs commenced this action in the Court of Common Pleas of Philadelphia County on January 6, 2016. Defendants successfully removed the action to the United States District Court for the Eastern District of Pennsylvania asserting federal question and diversity jurisdiction. Uber moved to dismiss the case and compel arbitration. Alternatively, as a separate matter, Uber moved to stay this action. The District Court denied both motions, concluding that Plaintiffs had complied with the arbitration opt-out procedures allowed by the Technology Services Agreement. Uber then moved for judgment on the pleadings, which the District Court granted in part and denied in part. The District Court found that Plaintiffs alleged sufficient facts to support that they were "employees" instead of "independent contractors," such that judgment on the pleadings was not appropriate.

Plaintiffs filed an Amended Complaint on October 13, 2016, and Uber moved to dismiss Plaintiffs' Amended Complaint in its entirety, as well as moved to strike certain portions of the Amended Complaint in the alternative. The District Court denied the motion to dismiss. The Court found that Plaintiffs' allegations that they were logged into the Uber Driver App and eligible to receive trip requests from prospective UberBLACK

10

riders ("Online") for more than 40 hours was sufficient to state a claim at the pleading stage under the FLSA. However, the District Court found that the question of whether Plaintiffs' time spent online was actually compensable work time within the meaning of the FLSA was a dispositive issue, and designated the issue of compensability of Plaintiffs' online time for expedited discovery.

After substantial discovery, Uber moved for partial summary judgment on the limited issue of whether, assuming that Plaintiffs qualify as "employees" and Uber as an "employer" under the FLSA for purposes of the motion only, the time they spent online on the Uber Driver App is compensable work time under the FLSA, and by extension, the PMWA. The Court ultimately denied the motion for partial summary judgment, determining that the compensability question at issue in the motion "may be inextricably intertwined with the threshold employee versus independent contractor question." App. 8.

After discovery was fully complete, Uber filed its motion for summary judgment on the dispositive question of whether Plaintiffs are employees or independent contractors. The District Court granted Uber's motion for summary judgment determining that Plaintiffs do not qualify as "employees" of Uber under the FLSA and PMWA. As a matter of law, the District Court found that Plaintiffs did not meet their burden to show that they are employees of Uber. Plaintiffs timely appealed from the summary judgment order.

## III.    Applicable Law: *Donovan v. DialAmerica Marketing, Inc.*

The minimum wage and overtime wage provisions at issue all require that Plaintiffs prove that they are "employees." 29

11

U.S.C. §§ 203, 206–207. Although Plaintiffs' case includes claims under the PMWA, Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA. *See Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004). The FLSA defines "employer" as "includ[ing] any person acting directly or indirectly in the interest of an employer in relation to an employee," and "employee" as "any individual employed by an employer." 29 U.S.C. §§ 203(d), (e)(1). Given the circularity of the definitions, federal courts, with guidance from the Department of Labor, have established standards to determine how to define employee and employer.

The Third Circuit utilizes the test outlined in *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376 (3d Cir. 1985), to determine employee status under the FLSA. This seminal case acknowledges that when Congress promulgated the FLSA, it intended it to have the "broadest definition of 'employee.'" *See id.* at 1382 (citing 81 Cong. Rec. 7657 (remarks of Senator Hugo L. Black)). In *DialAmerica*, we used six factors—and indeed adopted the Ninth Circuit's test—to determine whether a worker is an employee under the FLSA:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered required a special skill; 5) the degree of permanence of the working relationship; [and] 6) whether the

> service rendered is an integral part of the alleged employer's business.

*Id*. (quoting *Donovan v. Sureway Cleaners*, 656 F.2d 1368 (9th Cir. 1981)).

Our decision in *DialAmerica* is consistent with the Supreme Court's general guidance in *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947). In *Rutherford*, the Supreme Court first determined "employee" status under the FLSA. *Id.* at 728–30. And in *DialAmerica*, we agreed with *Sureway Cleaners* that "neither the presence nor absence of any particular factor is dispositive." 757 F.2d at 1382. Therefore, "courts should examine the circumstances of the whole activity," determining whether, "as a matter of economic reality, the individuals are dependent upon the business to which they render service." *Id.* (internal citations and quotation marks omitted). The burden lies with Plaintiffs to prove that they are employees. *See*, *e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946) (a plaintiff who brings suit under the FLSA "has the burden of proving that he performed work for which he was not properly compensated") (internal citations omitted).

## IV. The District Court Opinion

The District Court granted summary judgment to Uber ruling that drivers for UberBLACK are independent contractors within the meaning of the FLSA and similar Pennsylvania laws. The District Court, in applying the six factors, relied heavily on the analysis in *DialAmerica* and other cases that had examined the use of internet or app-based programs for acquiring work.

The District Court applied all six factors in *DialAmerica*, and on balance, found that Plaintiffs were independent contractors. There were four factors the Court applied that were interpreted in favor of independent contractor status. The District Court analyzed the employer's right to control the manner in which the work is to be performed and noted that the written agreements entered into by the Plaintiffs and their transportation companies, in addition to the ability of Plaintiffs to hire sub-contractors and work for competing companies, point to a lack of control by Uber. Next, the District Court analyzed the alleged employees' opportunity for profit or loss and found that this also supports independent contractor status. The District Court found that Plaintiffs can work as much or as little as they would like and choose not to accept trip requests where the opportunity for profit was greater to work for themselves or competitors. Because the "profit-loss" factor does not require that Plaintiffs be solely in control of their profits or losses, Plaintiffs were unsuccessful in convincing the District Court that they were employees despite the fact that Uber retains the right to determine how much to charge passengers and which driver receives which trip request. UberBLACK drivers must purchase or lease their own expensive vehicle to drive for UberBLACK, demonstrating independent status as well. And the "relationship permanence" can be as long or non-existent as the driver desires, again illustrating the impermanent working relationships often found with independent contractors.

The District Court determined that only two factors militated in Plaintiffs' favor. As limousine drivers, the service they render does not really require a special skill. Second, the limousine driving service rendered to Uber by UberBLACK drivers is an essential part of Uber's business as a

14

transportation company. The District Court held that the movant demonstrated that there was no genuine dispute as to any material fact, and that a majority of the *DialAmerica* factors leaned against employment status. The District Court granted Uber's motion for summary judgment and determined that Plaintiffs were independent contractors.

## V. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction over the Plaintiffs' FLSA claims under 28 U.S.C. § 1331. The District Court had and executed supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the District Court's order granting summary judgment is a final order.

This Court exercises plenary review over a District Court's grant of summary judgment. *Aruajo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013). This Court can affirm a grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party. *Id.* at 255. In attempting to defeat summary judgment, "[s]peculation and conclusory allegations do not satisfy [the nonmoving party's] duty." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).

15

## VI.	Analysis

### A.	*Genuine Disputes of Material Fact Exist*

For summary judgment to have been appropriate, there must have been no genuine disputes as to any material facts on the record, entitling Uber to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As such, if there is a genuine dispute of material fact, the question of which *DialAmerica* factors favor employee status is a question of fact that should go to a fact-finder.  Here, the ultimate question of law is whether Plaintiffs are employees or independent contractors, which is for a judge to decide.  But, if a court finds that there are any issues of fact that remain in dispute, it must resolve those disputes prior to granting summary judgment.  *See DialAmerica*, 757 F.2d at 1381.  In *DialAmerica*, the parties stipulated to some facts and reserved the right to present testimony on any remaining disputed issues.  Then, the district court held an evidentiary hearing on the remaining disputed issues of fact:

> (1)	the extent to which home researchers and distributors were dependent on DialAmerica;
> (2)	the extent to which they had an opportunity for profit or loss;
> (3)	the extent to which they exercised initiative, business judgment, or foresight in their activities;
> (4)	the extent of any financial investment in conjunction with their work for DialAmerica; and
> (5)	the extent to which the services provided by the home researchers and distributors were an integral part of DialAmerica's business.

16

*Id.*

These factual issues refer directly to the factors which determine whether someone is an employee or independent contractor. The district court resolved these disputes and granted DialAmerica's motion for summary judgment. We reviewed the district court's decision in *DialAmerica* and determined that summary judgment was a mischaracterization, but the proper outcome, as all the factual disputes were resolved prior to adjudication on the merits.[7] *Id*. at 1381, 1388.

*DialAmerica* teaches that where there are questions of fact that need resolution, these questions must go to a fact-finder.[8] This

---

[7] In *DialAmerica*, Judge Becker noted that, because the district court held a two-day hearing to find relevant facts, this Court would "simply treat the [district] court's letter opinions as the findings of facts and conclusions of law required by Fed. R. Civ. P. 52, and its orders as judgments entered after trial pursuant to Fed. R. Civ. P. 58." 757 F.2d at 1381–82. Here, that avenue is not available to us, as no evidentiary hearing was held to find relevant facts to determine if summary judgment was appropriate.

[8] An important distinction exists between a factual dispute, and a factual dispute that is material. Summary judgment is correctly granted in many situations where the parties genuinely dispute facts but where the dispute is not material to the adjudication of the case. *See, e.g.*, *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (granting summary judgment on the question of employee versus independent contractor status, but noting that "[i]n some cases, one or more

case presents such genuine disputes of material facts. Uber submitted a Statement of Undisputed Material Facts to which Plaintiffs responded with almost a hundred pages of disputes. For example, disputed facts include whether Plaintiffs are operating within Uber's system and under Uber's rules, and whether Plaintiffs or their corporations contracted directly with Uber. Although the District Court states that its decision derived from undisputed facts, the disputes presented by the parties go to the core of the *DialAmerica* factors and present a genuine dispute of material facts. Accordingly, we will remand to the District Court as summary judgment was inappropriate.

## B. The "Right to Control" Factor

To illustrate that there are genuine disputes remaining, we look to the first *DialAmerica* factor: "the degree of the alleged employer's right to control the manner in which the work is to be performed." *DialAmerica*, 757 F.2d at 1382 (citation omitted). While not dispositive, this factor is highly relevant to the FLSA analysis. The District Court in this case held that the first factor supported a finding of independent contractor status. Actual control of the manner of work is not essential;

---

genuine issues of fact concerning the relevant economic relations may preclude a trial court from drawing a conclusion as a matter of law on the . . . issue[,]" and addressing that it would be appropriate for those cases to go to trial so that the genuine disputes of material fact be resolved by the jury). Here, genuine disputes of material fact exist because certain facts bear on how the *DialAmerica* factors will be resolved.

rather, it is the right to control which is determinative. *Drexel v. Union Prescription Ctrs.*, 582 F.2d 781, 785 (3d Cir. 1978).

The parties contest whether Uber exercises control over drivers. While Uber categorizes drivers as using the Uber App to "connect with riders using the UberBLACK product," App. 486, which may imply that drivers independently contract with riders through the platform, Plaintiffs contend that this is not so. Uber also contends that drivers can drive for other services while driving for Uber, however Plaintiffs contend that while "online" for Uber, they cannot also accept rides through other platforms. Plaintiffs reference Uber's Driver Deactivation Policy that establishes that "soliciting payment of fares outside the Uber system leads to deactivation" and "activities conducted outside of Uber's system—like anonymous pickups—are prohibited." App. 487.

Uber also asserts that it does not control the "schedule start or stop times" for drivers or "require them to work for a set number of hours." App. 536. Again, Plaintiffs dispute this, stating that the Uber Owner/Operator Agreement states, "[the] frequency with which [Uber] offers Requests to [the driver] under this Agreement shall be in the sole discretion of the Company" and "the number of trip requests available to Plaintiffs is largely driven by Uber." *Id*.

The above factual disputes all go to whether Uber retains the right to control the Plaintiffs' work. The District Court in its analysis acknowledged what the Plaintiffs asserted, but assigned little value to their assertions in light of Uber's contractual agreement with Plaintiffs, Uber's assertion that Plaintiffs are permitted to hire sub-contractors, and that "plaintiffs and their helpers are permitted to work for competing companies." App. 31. However, whether Plaintiffs

are considered to "work" for a competing company while being "online" on the Uber Driver App is also a disputed factual issue. This illustrates why summary judgment was inappropriate at this stage.

Further, these and other disputed facts regarding control demonstrate why this case was not ripe for summary judgment. For example, Plaintiffs assert that "Uber does punish drivers for cancelling trips," App. 539, and "Uber coerces UberBLACK drivers to go online and accept trips by making automatic weekly deductions against their account." App. 538. Plaintiffs additionally assert that they derived all of their income for their respective businesses from Uber in certain years, which Uber disputes.

Although both parties argue that there are no genuine disputes regarding control, the facts adduced show otherwise. While Uber determines what drivers are paid and directs drivers where to drop off passengers, it lacks the right to control when drivers must drive. UberBLACK drivers exercise a high level of control, as they can drive as little or as much as they desire, without losing their ability to drive for UberBLACK. However, Uber deactivates drivers who fall short of the 4.7-star UberBLACK driver rating and limits the number of consecutive hours that a driver may work.

*C.    Opportunity for Profit or Loss Depending on Managerial Skill*

As with the right to control, the District Court held that there was no genuine dispute as to another factor—the opportunity for profit or loss depending on managerial skill. Again, we disagree with the District Court's conclusion. The District Court, in this case, ruled that this factor strongly favored

independent contractor status because drivers could be strategic in determining when, where, and how to utilize the Driver App to obtain more lucrative trip requests and to generate more profits. Plaintiffs could also work for competitors and transport private clients.[9]

However, other material facts reveal that there was and still is a genuine dispute. For example, Uber decides (1) the fare; (2) which driver receives a trip request; (3) whether to refund or

[9] Indeed, the District Court stressed Plaintiffs' ability "to make money elsewhere[.]" App. 35. Yet, based on our precedent, it is unclear whether this factor looks only toward opportunity for profit or loss *within* the alleged employment relationship or whether it also contemplates one's ability to make money elsewhere—as such, external factors, such as the ability to earn outside revenue without terminating the Uber-driver relationship, may be irrelevant to the analysis. *See Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294 (3d Cir. 1991) (noting that "station operators had no meaningful opportunities for profit nor . . . loss, because the volume of business depended upon the location of each station rather than upon the managerial skills of the operators" but not discussing whether station operators had other jobs elsewhere); *see also Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141–42 (2d Cir. 2017) (considering a worker's ability to earn income from competitors and other sources, but emphasizing that "it is not what Plaintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." (internal citation, alteration, and quotation marks omitted)). As this argument was not able to be developed by the parties, this, along with other material factual disputes, is ripe to be developed at trial.

cancel a passenger's fare; and (4) a driver's territory, which is subject to change without notice. Moreover, Plaintiffs can drive for competitors, but Uber may attempt to frustrate those who try, and most of the factors that determine an UberBLACK driver's Uber-profit, like advertising and price setting, are also controlled by Uber.[10] Under the circumstances, we believe that a reasonable fact-finder could rule in favor of Plaintiffs.[11] Thus, summary judgment was inappropriate.

---

[10] The District Court also considered "Plaintiffs investments in their own companies" as "relevant to the 'profit and loss' factor," as weighing "heavily in favor of 'independent contractor' status." App. 36. But, as stated earlier, parties frame this issue differently and assert different facts—again showing that summary judgment was inappropriate. For example, Uber asserts that Plaintiff Razak's ITC Luxe Limousine Services, Inc. invested in up to sixteen vehicles and had as many as fourteen to seventeen drivers. And while Plaintiffs do not deny that they invested in their personal vehicles, which they use to provide UberBLACK rides, as discussed already, there is an inherent dispute regarding whether drivers are allowed to exercise judgment and select the farthest rides for the largest payment, as Uber determines which driver is given which rider.

[11] We also note that the District Court did not interpret whether Plaintiffs could in actuality exercise any managerial skill while being "online" to increase their profits, only that they could

22

## D.  *Remaining* DialAmerica *Factor Analysis*

Of the remaining factors, some do not require further factfinding, while others still do.  The fifth factor, degree of permanence of the working relationship, has genuine disputes of material fact.  On one hand, Uber can take drivers offline, and on the other hand, Plaintiffs can drive whenever they choose to turn on the Driver App, with no minimum amount of driving time required.

Alternatively, the fourth factor, whether the service rendered requires a special skill, is clearer.  It is generally accepted that "driving" is not itself a "special skill."  *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014).  Although there may be a distinction between "driving" and "replicat[ing] the limousine experience," as noted by the District Court, it is not enough to overcome the presumption that driving is not a special skill.  App. 38.  This fourth factor certainly weighs in favor of finding that Plaintiffs are employees.[12]

---

potentially choose to perform other jobs to make a greater profit.

[12] Lastly, the District Court found that the work UberBLACK drivers provide is integral to the service Uber renders under the sixth *DialAmerica* factor.  Simply put by the District Court, "it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function."  App. 40.  We acknowledge that Uber strenuously disputes this finding, insisting instead that it is a technology company that supports drivers' transportation businesses, and not a transportation company

## VII. Conclusion

In reviewing the District Court decision *de novo*, we determine summary judgment was inappropriate because genuine disputes of material facts remained. We do not opine on whether the disputed facts should be resolved by a jury or the District Court through a Rule 52 proceeding, as was the case in *DialAmerica*. However, these material factual disputes must be resolved. For the foregoing reasons, we will remand the matter for further proceedings.

---

that employs drivers. We also believe this could be a disputed material fact that should be resolved by a fact-finder.