**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2527
_____

RAHMON RICHARDSON,
Appellant

v.

CITY OF NEWARK; OFFICER NEIL LAURIE; SERGEANT ROWE THOMAS;
JOHN DOES 1 through 10, individually and in their official capacity; ROBERT DOES 1
through 10, individually and in their official capacity
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-16-cv-00265)
District Judge:  Honorable Madeline Cox Arleo
_____

Argued: April 16, 2020

Before:  CHAGARES, SCIRICA, and ROTH, Circuit Judges.

(Filed: August 14, 2020)

Michael A. Barsimanto, Esq.          [ARGUED]
The Maglione Firm
186 Clinton Avenue
Newark, NJ 07108
        Counsel for Appellant Rahmon Richardson

Wilson D. Antoine, Esq.          [ARGUED]
City of Newark

Department of Law
Room 316
920 Broad Street
Newark, NJ 07102
        Counsel for Appellees City of Newark, et. al.

_____

OPINION*

_____

CHAGARES, Circuit Judge.

Plaintiff Rahmon Richardson was shot in the leg by defendant Newark, New

Jersey Police Officer Neil Laurie while fleeing and after forcibly entering an apartment

building in Newark.  Richardson filed this lawsuit against Laurie, the City of Newark,

and others, alleging that Laurie used excessive force and falsely arrested him, among

other related claims.  The District Court denied Richardson's motion for partial summary

judgment and granted Laurie and the City of Newark's motion for summary judgment in

full, ending Richardson's case.  Richardson appeals that order.  For the reasons set forth

below, we will affirm.

I.

We write for the parties and so recount only the facts necessary to our decision.

On November 6, 2013, Richardson was living at his girlfriend's apartment on Ludlow

Street in Newark.  Richardson lived in the first-floor unit, with unrelated tenants living on

units on the second and third floors.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

2

Richardson testified that on the day of the incident, he went to buy a sandwich and a beer and that as he was walking home to Ludlow Street with two others, he was stopped by Laurie. Laurie asked where they were all headed, and Richardson and one of the others simultaneously replied "home." Appendix ("App.") 171. Laurie asked where that was. Richardson replied, "around the corner." App. 246. Laurie asked "around the corner where?" and Richardson replied "Ludlow, right there on the corner house." App. 171–72; 246–47.

Laurie asked again where they were headed, and Richardson repeated that he was headed home, and then twice asked Laurie why he was stopping them. Laurie replied that Richardson was making him nervous. In response to that comment, Richardson handed the plastic bag he was carrying to Laurie, which contained a sandwich and a beer. Laurie looked through the bag and kept holding it.

Richardson also testified that during this initial stop, Laurie never frisked or touched him. However, according to Richardson, Laurie did reach for Richardson's left chest jacket pocket, which Richardson testified contained his wallet and a pack of sunflower seeds. In response, Richardson backed up and asked Laurie a third time why he was stopping him.

Laurie then asked Richardson whether he had any open warrants. At this point, Richardson turned and ran. Richardson testified that he ran because he was on parole, he knew that he had failed to inform his parole officer about a ticket for parking in a handicapped spot, and he believed that this failure constituted an automatic violation of parole. So, he was afraid and ran.

3

As Richardson ran, he could hear different officers yelling at him to stop and that he had a gun. Richardson intended to run to his home via "the back way" through an alley. App. 174. Laurie chased Richardson on the street, so that the two were running in parallel but separated by a fence. Richardson ran up past a two-car garage and up the stairs in the front of the apartment building, rang the first and second bells, then went over a make-shift fence on the side of the building. At this point, Richardson was on the left-hand side of the building if one was facing the building, with Laurie on the right-hand side of the building.

Richardson testified that as he got to the back-left corner of the building, he did not see anyone, so he walked up to one of his apartment's windows.[1] When he got to the window, Laurie appeared, pulled out his gun, and told Richardson to raise his hands, which Richardson did. Laurie told Richardson not to move, and for the time, Richardson complied.

As Laurie started walking towards Richardson from the street, Laurie stumbled over the curb. Richardson took the opportunity to run towards the back door of the apartment building. While Richardson was at the back door, Laurie came around a fence at a sharp angle and slipped and fell.

According to Richardson, at this point, he and Laurie were staring at each other, when Laurie shot at Richardson but missed. Richardson forcibly pushed in the back door with his shoulder and ran through the building, then attempted to exit via another door.

---

[1] Richardson also testified that he unsuccessfully attempted to open one of the windows from the outside, but failed, as it was locked.

4

As Richardson prepared to pry the interior door open with his fingers, Laurie shot him in the back of his left leg. Richardson was unable to continue fleeing, and Laurie took him into custody.

Officer Laurie testified to a somewhat different version of events, albeit one that overlaps with Richardson's in certain key respects. Laurie testified that when he initially approached Richardson, he could see Richardson "fixing, adjusting something in his front waistband under his jacket" and could also see "the bulge in his front jacket." App. 378. According to Laurie, when Richardson backed away from him, Laurie could see the bulge and saw Richardson's hand starting to go "back to the front waistband, so that is when I lunged forward." Id. Laurie told Richardson to stop moving and then frisked Richardson, recounting that he felt the gun under the jacket, grabbed the jacket, and saw the gun, before Richardson "slapped my hands away and took off" running. Id.

Laurie testified that he lost sight of Richardson but eventually found him standing in a backyard, holding a gun. According to Laurie, Richardson disregarded his orders to drop the gun and ran to the side entrance of the house with the gun still in his hand. When Laurie slipped after coming around the fence, he fell to one knee and saw Richardson turn to face him. Laurie testified, "I knew [Richardson] was going to shoot me because I had nowhere to go so the only thing I could do was fire my weapon so I shot my weapon." Id. Laurie then fired two rounds at Richardson, missing him both times.

Because Laurie did not know exactly who lived in the building, he was concerned that there could be a family inside. So Laurie followed Richardson into the building,

5

where he saw Richardson "trying to get through another door." App. 379. Laurie could not see Richardson's hands, so he yelled at him to drop the gun. Richardson turned around, and Laurie thought that Richardson was "definitely going to shoot me now" so Laurie shot Richardson. Id.

According to Laurie, he then told Richardson to throw the gun away, but Richardson told him "I don't have the gun" and that Richardson had dropped it outside. Id. After Police Sergeant Roe arrived, Laurie told Roe to stay with Richardson while Laurie searched for the gun outside. Laurie testified that it was at this time that he went outside and found the gun in the alleyway. There is no dispute that Laurie did find a handgun in the alleyway.

The main points of factual disagreement between Laurie and Richardson are that Richardson testified that he was never frisked and that he was never carrying a gun, while Laurie testified that he frisked Richardson, saw the gun inside Richardson's clothes, and saw Richardson holding the gun outside of the building. Importantly, however, both agree that Richardson had objects that could have formed a bulge in his pocket, that Richardson fled from the police, and that when Laurie fired the shot that hit Richardson, Richardson had just forced entry into the apartment building and was then attempting to forcibly pry open a different door in the building.[2]

---

[2] Richardson was subject to criminal proceedings in the Superior Court of New Jersey that resulted in his pleading guilty to a charge of obstruction of administration of law, based on his flight from Laurie. The Superior Court also held at this time that Laurie's initial stop of Richardson was unconstitutional and it suppressed evidence of the gun as fruit of the poisonous tree. The parties are aware of those proceedings and they need not be detailed here.

6

Richardson brought this action against Laurie for violations of his constitutional rights under federal and state law and asserted state law tort claims of assault and battery, intentional and negligent infliction of emotional distress, negligence, and false arrest. Richardson similarly sought liability against the City of Newark for violation of his constitutional rights (under Monell v. Department of Social Services, 436 U.S. 658 (1978)) and for the state law tort claims (under respondeat superior liability). Laurie and the City of Newark moved for summary judgment, and Richardson cross-moved for partial summary judgment on the issue of Monell liability. The District Court granted the defendants' motion and denied Richardson's motion.

With respect to Richardson's civil rights claims under federal and state law, the District Court concluded that Laurie was entitled to qualified immunity, reasoning that no excessive force constitutional violation occurred and that even if there was a constitutional violation, Laurie did not violate any clearly established right. Given its conclusion that there was no underlying constitutional violation, the District Court determined that Richardson's Monell claim for municipal liability failed as well. And for substantially the same reasons Laurie was entitled to qualified immunity, the District Court concluded that Richardson's state tort claims were barred by the good faith immunity conferred by the New Jersey Tort Claims Act. Finally, with respect to Richardson's false arrest claim, the District Court concluded that the claim was barred by his guilty plea in the state court criminal proceedings, which established that there was probable cause for his arrest. The District Court also determined that because Laurie was

7

not liable for any of the state law claims, the City of Newark also could not be liable for any of those claims.

This timely appeal followed.

## II.[3]

We exercise plenary review over a District Court's grant of summary judgment. Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020). We will only affirm a grant of summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law" and is "'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As we review the summary judgment record, we "examine the evidence . . . in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

Because many of the issues in this appeal rise or fall with the viability of Richardson's excessive force claims under federal and state law, we first explain why we conclude that the District Court correctly determined that Laurie is entitled to qualified immunity from suit with respect to Richardson's federal excessive force claim.

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have appellate jurisdiction under 28 U.S.C. § 1291.

A.

Richardson contends that the District Court erred in concluding that Laurie did not violate Richardson's constitutional right to be free from excessive force, and that even if a constitutional violation occurred, Laurie was entitled to qualified immunity. Because we agree with the District Court's conclusion on qualified immunity, we do not reach the question of whether Laurie's conduct actually violated Richardson's constitutional rights.

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

A clearly established right in this context means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Although the Supreme Court's "caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)).

While conceding that he cannot cite precedent that is factually on point, Richardson advances two arguments in support of his position that Laurie violated a

9

clearly established constitutional right by shooting him after he fled the initial stop and broke into the apartment building. First, Richardson cites the Supreme Court's decision in Tennessee v. Garner for the proposition that "a police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. 1, 11 (1985). But the Supreme Court has subsequently held that because Garner "lay[s] out excessive-force principles at only a general level" and because "general statements of the law are not inherently incapable of giving fair and clear warning to officers," Garner does not by itself "create clearly established law outside an obvious case." White, 137 S. Ct. at 552 (quotation marks and citations omitted).

In essence, Richardson contends that because there is a genuine factual dispute as to whether he was armed and as to whether a reasonable officer would have thought he was fleeing into his home, rather than breaking into a stranger's, a jury could reasonably conclude that he was neither armed, nor dangerous, and only fleeing from Laurie, making this an "obvious case" under Garner. We disagree. Even if a jury credited Richardson's testimony with respect to the gun, Richardson conceded that he had fled from Laurie and forcefully entered the apartment building before Laurie fired the shot that hit him. Similarly, Richardson agreed that his jacket pocket contained items that would have created a bulge. Finally, while Richardson's subjective intent in attempting to use the second door was apparently to continue fleeing outside the apartment building, he does not contend that a reasonable officer in Laurie's position would have understood that Richardson was attempting to exit the building, as opposed to breaking into a different apartment.

10

Richardson thus fails to contend with Garner's holding that deadly force may be used where an "officer has probable cause to believe that [a fleeing] suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. at 3 (emphasis added). Moreover, the Supreme Court has held that the Fourth Amendment reasonableness inquiry must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396–97 (1989). The conditions leading to such a decision are the facts as reasonably understood by the police officer when the split-second decision had to be made, not contrary facts as testified to by the plaintiff.

Accordingly, this is not an "obvious case" under Garner, and Richardson cannot rely upon that case to show that Laurie should not be covered by qualified immunity. See James v. New Jersey State Police, 957 F.3d 165, 170 n.5 (3d Cir. 2020) (noting that excessive force claim did not present "an obvious case" where "a reasonable officer could have perceived that [the plaintiff] posed a serious threat of immediate harm to others" (quotation marks omitted)).

Second, Richardson contends that a reasonable officer would have understood that this shooting was constitutionally impermissible based on our holding in Bennett v. Murphy that "[i]f, as the plaintiff's evidence suggested, David Bennett had stopped advancing and did not pose a threat to anyone but himself, the force used against him, i.e. deadly force, was objectively excessive." 274 F.3d 133, 136 (3d Cir. 2001). Bennett involved a "prolonged armed standoff between David Bennett and police officers in a

11

field near an apartment complex" that "culminated in Bennett's being fatally shot by" a state trooper. Id. at 134. Richardson reasons that because there is a genuine dispute of fact here as to whether he was even armed, his shooting is even more clearly a constitutional violation than was Bennett's. But the facts of Bennett bear almost no similarity to those of this case, and so whether Richardson's constitutional rights were violated or not, he cannot rely upon that case to show that any such right was clearly established. See Kisela, 138 S. Ct. at 1153 ("[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." (quoting Mullenix v. Luna, 136 S. Ct. 305, 309 (2015)); District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (requiring established law to "clearly prohibit the officer's conduct in the particular circumstances before him" with "a high degree of specificity").

For these reasons, the District Court did not err in concluding that Laurie was entitled to qualified immunity for Richardson's federal excessive force claim.[4]

---

[4] Richardson's state civil rights and tort claims for assault, battery, negligence, and negligent and intentional infliction of emotional distress all similarly arise from the shooting. For substantially the same reasons that Laurie is entitled to qualified immunity for Richardson's federal constitutional excessive force claim, Laurie is also entitled to good faith immunity under New Jersey law for these state law claims, because he did not violate any of Richardson's clearly established rights. See N.J. Stat. Ann. § 59:3-3 (public employees are not liable if they "act[] in good faith in the execution or enforcement of any law" except with respect to false arrest claims); Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 582, 969 A.2d 1097, 1112 (2009) (noting that public employees are entitled to good faith immunity where they "establish that [their] acts were objectively reasonable or that [they] performed them with subjective good faith." (quotation marks omitted)).

12

B.

Richardson also contends that the District Court erred in granting the City of Newark's and Laurie's (the "Newark defendants") motion for summary judgment with respect to his false arrest claim. Richardson's complaint alleges in a conclusory manner that the Newark defendants falsely arrested and detained him without specifying even whether the claim was based upon his actual arrest or the initial investigatory stop. The District Court construed Richardson's false arrest claim to complain exclusively of Richardson's actual arrest, and on that basis concluded that Richardson's guilty plea arising from the arrest precluded him from bringing the false arrest claim, because entry of a guilty plea establishes probable cause for an arrest. On appeal, Richardson's theory of liability on the false arrest claim remains elusive. Richardson contends that the District Court erred but, as in his complaint, fails to make clear whether his claim is based upon his arrest or the investigatory stop. To the extent that the false arrest claim is based upon the arrest, the District Court correctly determined that summary judgment was appropriate. Probable cause for an arrest is an "absolute defense" to a false arrest claim, Wildoner v. Borough of Ramsey, 744 A.2d 1146, 1154 (N.J. 2000), and by pleading guilty Richardson conceded that there was probable cause to arrest him. See Perez v. City of Elizabeth, No. A-2932-14T2, 2016 WL 6134927, at *1 (N.J. Super. Ct. App. Div. Oct. 21, 2016) (concluding that plaintiff's "guilty plea barred her from asserting claims based upon false arrest"); Obchinetz v. Maple Shade Twp., No. A-4289-13T4, 2015 WL 3869711, at *4 (N.J. Super. Ct. App. Div. June 24, 2015) (noting that

13

plaintiff's "guilty plea effectively waived any challenge as to probable cause for his arrest").[5]

The District Court did not err in granting the Newark defendants' motion for summary judgment with respect to Richardson's false arrest claim.

C.

Finally, the District Court granted the City of Newark's motion for summary judgment with respect to Richardson's claim against the City of Newark for Laurie's alleged violation of Richardson's right to be free from excessive force.  The District Court concluded that because there was no underlying violation of Richardson's constitutional rights, this claim failed.  While we do not reach the question of whether a constitutional violation occurred, we will affirm on other grounds supported by the record.

Section "1983 claim[s] against a municipality may proceed in two ways": plaintiffs can establish that "an unconstitutional policy or custom of the municipality led to his or her injuries . . . or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."  Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citations omitted).  Plaintiffs establishing

---

[5] To the extent that the false arrest claim was in fact based upon the investigatory stop, Richardson has failed to preserve this argument.  See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 145 (3d Cir. 2017) ("[C]onsistent with Federal Rule of Appellate Procedure 28(a) and Third Circuit Local Appellate Rule 28.1 . . . an appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal," and "we have consistently refused to consider ill-developed arguments or those not properly raised and discussed in the appellate briefing.").

municipal liability under this second "failure or inadequacy" route — which does not require showing an actual unconstitutional policy — must demonstrate that the "failure or inadequacy" rose to the level of "deliberate indifference on the part of the municipality." Id. at 106. In order to meet the deliberate indifference standard in a failure-to-train claim, "the identified deficiency in a city's training program must be closely related to the ultimate injury." City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989).

While Richardson and his experts point to systemic failures by the City of Newark to address police shootings through proper training, supervision, and discipline, Richardson fails to demonstrate any close nexus between the City's failures and the specific circumstances here. Although Richardson details what he characterizes as failures to investigate police shootings generally, his briefs make no argument that the City has failed to train, supervise, or discipline officers with respect to any of the unusual confluence of factual circumstances in this case, involving flight, forceful entry into an apartment building, and the possible presence of a gun.[6] Accordingly, we will affirm the District Court's order granting the Newark defendants' motion for summary judgment and denying Richardson's motion for partial summary judgment as to Richardson's excessive force claim against the City of Newark.

---

[6] Despite focusing his municipal liability claim on a claimed failure or inadequacy, Richardson also peppers his brief with stray references to allegedly unconstitutional customs or policies, but does not explain why and how he satisfies the required elements for bringing a claim under that alternate theory of liability. To the extent that Richardson proceeds under this alternate theory, his claims fail for similar reasons, as his briefs make no argument showing "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." City of Canton, 489 U.S. at 385.

III.

For the foregoing reasons, we will affirm the District Court's order granting the Newark defendants' motion for summary judgment and denying Richardson's motion for partial summary judgment.